**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT VOGEL, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:12-cv-01250-JFC |
| | ) | |
| v. | ) | |
| | ) | |
| PITTSBURGH PUBLIC SCHOOL | ) | |
| DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**CONTI, Chief District Judge.**

In this civil action, plaintiff Robert Vogel ("Vogel" or "plaintiff"), a former employee of

the Pittsburgh Public School District ("PPSD" or the "District"), alleges that he was subjected to

unlawful age-related discrimination and retaliation in connection with two adverse ratings which

he received relative to the 2010-2011 and 2011-2012 school years. Because of his two

consecutive adverse ratings, Vogel was unable to retain his teaching position with the District.

He now seeks relief against PPSD under the Age Discrimination in Employment Act, 29 U.S.C.

§621 *et seq* ("ADEA")[1] Presently pending before the court is PPSD's motion for summary

judgment (ECF No. 26), which will be granted for the reasons that follow.

**I. Factual Background**

Vogel was born in 1954 and was fifty-seven years old as of January 12, 2012, the date he

received his second unsatisfactory rating. (DSMF 13, 124.)[2] Between 1990 and 1996, Vogel

---

[1] This court has subject-matter jurisdiction over Vogel's complaint pursuant to 28 U.S.C. §1331.

[2] The designation "DSMF ___" refers to the PPSD's Concise Statement of Material Facts, and any responses thereto
or replies in support thereof, as set forth in the parties' Combined Concise Statement of Material Facts (ECF No.
44). The designation "PSMF ___" elsewhere in this Memorandum Opinion will refer to the Vogel's Statement of

was employed by PPSD in various capacities as a substitute teacher.  (DSMF 14.)  Part way through the 1996-1997 school year, Vogel assumed a full-time position teaching 6th grade social studies and science at Rogers Middle School for the Creating and Performing Arts ("Rogers") within the District.  (DSMF 15.)  Vogel continued in that capacity until Rogers closed in June 2009 and merged into the Pittsburgh Creative and Performing Arts High School, resulting in the formation of a new joint school known as "Pittsburgh CAPA 6-12" ("Pittsburgh CAPA").  (DSMF 15, 40.)

Vogel began teaching at Pittsburgh CAPA at the start of the 2009-2010 school year and remained there until his employment with the District was terminated in January 2012.  (DSMF 41, 124.)  During Vogel's tenure at Pittsburgh CAPA, Melissa Pearlman ("Pearlman") was the school's principal, a position she had held since April 2009.  (DSMF 23.)  Joan Murphy ("Murphy") served as at various times as the intervention coach, acting assistant principal, and "Director of the 6-8 School."  (DSMF 38; Murphy Dep. 6:4-7:17, ECF No. 29-10.)  Anita Ravi ("Ravi") served as the social studies curriculum supervisor and was later replaced in that capacity by Michael Dreger ("Dreger").  (DSMF 30.)  Ronald Jones, Ph.D. ("Jones"), was the director of Pittsburgh CAPA and had previously served as the principal of Rogers during Vogel's final year there.  (DSMF 38.)  Patti Camper ("Camper") was the PELA[3] Resident at Pittsburgh CAPA for the 2010-2011 school year.  (DSMF 39.)  As supervisory personnel, Pearlman, Murphy, Ravi, Dreger, Jones, and Camper were all state certified to conduct formal observations of teachers and evaluate them.  (DSMF 23, 29, 31, 38; Spolar Dep. 29, ECF No. 29-5.)

---

Additional Material Facts, and any responses thereto, as set forth in the same Combined Concise Statement of Material Facts.  The court cites to these material facts only to the extent they are expressly admitted or functionally unopposed based on the evidence of record.

[3] PELA refers to the Pittsburgh Emerging Leadership Academy, a rigorous principal training program.  (DSMF 25.)

In his first year at Pittsburgh CAPA, Vogel taught four 6th grade social studies classes and one 6th grade science class, served as the bus transportation coordinator, coached three sports, and was the 6th grade Instructional Teaching Leader ("ITL"). (DSMF 42.) Vogel did not believe that the school consolidation was a good idea, and his transition to Pittsburgh CAPA was admittedly difficult. (DSMF 43, 44.) Among other things, he perceived "friction" between the teaching staffs from the two schools and felt that the Rogers' teachers "were like the unwanted stepchild" to unwelcoming high school teachers and a principal "forced to accept" them. (DSMF 45, 46.) He believed that neither Pearlman nor the high school staff "were prepared to deal with 300 middle school kids coming…to…'their building.'" (DSMF 47.)

Despite these difficulties, Pearlman rated Vogel's performance "satisfactory" for the 2009-2010 school year. (DSMF 51.) Prior to the end of that year, Pearlman asked Vogel whether he wanted to teach social studies or science because he was teaching two subjects in addition to serving as transportation coordinator and coaching three sports. (DSMF 52.) Vogel chose to teach social studies and, beginning with the 2010-2011 school year, he taught four 6th grade classes and one 7th grade class. (DSMF 53.) Vogel was in favor of this arrangement because it made his workload more manageable. (DSMF 54.)

Vogel's Performance Evaluation for the School Year 2010-2011

Pursuant to the District's standard procedure, administrators observed Vogel's classroom in the beginning of the 2010-2011 school year. (DSMF 26, 59.) Jones, the Pittsburgh CAPA director, informally observed Vogel on September 13, 2010. (Murphy Dep. Ex. 1, PPSD-000442, ECF No. 29-11.) During this class session, Jones noted two girls engaged in a private conversation and writing on each other's hands, apparently unnoticed by Vogel, while another student was reading aloud to the class. (Id. at PPSD-000485.) Jones reported that Vogel had

devoted too much time on the warm-up portion of the class, and he questioned whether Vogel's set up of group tables was designed to facilitate learning. (Id.)

On September 28, 2010, Jones conducted a formal observation of one of Vogel's social studies classes. The lesson for that day required students to use computers to conduct research on the history of Pittsburgh and then select five photographs from a website which they would then write about. (Id. at PPSD-000455, ECF No. 29-11.) Jones noted that no "Learning Objective" or "Overarching Question" had been posted on the board for students to reference throughout the period. As he circulated throughout the classroom to help students access the website, Jones observed "a great deal of side bar conversations unrelated to the learning activity." (Id.) By the end of his observation, most students had only written about two or three photographs. Jones held a follow-up conference with Vogel and provided him a copy of his report, in which he wrote:

> I have a concern relative to the length of the warm-up and why this learning activity consumed so much of the 6th period. Secondly, because students experienced difficulty accessing the web site your students were very noisy, and I am not sure what rituals and routines are in place for this class. Finally, I wonder what preparation occurred prior to your class engaging in this learning activity to ensure that students could easily access the web site and the photographs students were to select for the activity.

(Murphy Dep. Ex.1 at PPSD-000455, ECF No. 29-11.) Jones recommended that Vogel "[c]reate ways to engage students in collaborative group work," "[p]lace the learning objective(s) on the board so that students can reference them throughout the class period and so that they know the expectations for the time spent in [the] classroom," and "[e]stablish rituals and routines to create a more orderly method" for student participation and group work. (Id. at PPSD-000456.)

On November 22, 2010, Pearlman and Camper conducted an informal observation of Vogel's sixth period geography class. (Murphy Dep. Ex. 1 at PPSD-000442, PPSD-000487,

4

ECF No. 29-11.)  On that date, Vogel was showing his class a video about the Lewis and Clark expedition.  Pearlman and Camper did not believe that the film was aligned with the District's geography curriculum, and they met with Vogel two days later to discuss their concerns. (Id.) Camper reported that no overarching question was posted for the lesson and students were unable to explain how the lesson tied in to the culminating project on U.S. cities.  (Id. at PPSD-000488.)  She noted that only five of twenty-six students spoke during the discussion segment. (Id.)  Pearlman wondered what methods Vogel had in place to ascertain whether the objective of the lesson (i.e., learning how the Lewis and Clark expedition opened the western U.S. for expansion and settlement) had been achieved.  (Id. at PPSD-000489.)

Camper informally observed Vogel again on November 29, 2010 during his seventh period social studies class.  On that date, students were conducting presentations on the city of their choice as part of a culminating unit project.  Camper reported that the assignment had been modified from the way that it was written in the curriculum.  (Murphy Dep. Ex. 1, PPSD-000442, ECF No. 29-11.)  Ravi informally observed these student presentations two days later and reported that the material being presented on power points was factually incorrect.  (Id. at PPSD-443, ECF. No. 29-11.)

On December 7, 2010, Camper conducted a formal observation of Vogel's world geography and archaeology class.  (Murphy Dep. Ex. 1, PPSD-455, ECF No. 29-11.)  The objectives posted on that day required the students to choose three cities and countries in Latin America to research on the internet and then answer specific questions on a graphic organizer concerning the student's chosen mode of transportation, the city's vegetation and climate, the location where the student would stay, and what food he or she would eat.  (Id.)  Camper noted that the assignment sheet had been adapted from the curriculum and that the objective that had

5

been posted did not indicate a learning outcome.  (Id.)  When Camper asked students to identify the final destination of the activity on a map, only three of twelve could do so and none had been given directions on how to search for information.  (Id.)  None of the twelve students Camper spoke with were aware of their grade to date, and none of the six binders Camper checked included completed or evaluated student work.  (Id. at PPSD-456, ECF No. 29-11.)  Camper noted that all twenty-six students in the class had received the same assignment sheet and graphic organizer, and there was no evidence of differentiation in the lesson among the various students based on their individual capabilities.  (Id. at PPSD-455-456.)  By the end of the class, only three of the twenty-six students had been able to complete the graphic organizer, and Camper saw no evidence of Vogel conducting a formative assessment so as to determine which students had achieved the objective.  (Id. at PPSD-456.)

Camper met with Vogel on December 8, 2010, to discuss her observations and offer recommendations for better planning, engaging all students, and improving the use of classroom technology.  (Murphy Dep. Ex. 1, PPSD-000456, ECF No. 29-11.)  Camper recommended that Vogel utilize the curriculum to "begin to include the overarching question for each unit or model, as well as the intended objective for the lesson, intended student work products and assessment for measuring student mastery of the intended objective."  (Id.)  Camper felt that Vogel should "[p]lan more purposeful groupings" of his students "based on student data" and "include the use of the student notebooks to provide students with scaffolds and reflection tools from the previous lesson."  (Id.)  She recommended that he "[p]rovide students with modeling and direct instruction on how to effectively utilize technology."  (Id.)

Following the foregoing evaluations, Vogel was placed on an Employee Improvement Plan ("EIP") effective December 15, 2010.  (DSMF 64, 68.)  According to PPSD, an EIP is a

plan of support given to teachers who are not proficient in their classroom practice and who need guidance in order to become more effective. (DSMF 56.) Vogel's EIP indicated the following areas of practice where improvement was needed:

**Preparation**:

Evidence[ ] planning which reflects school district goals and adopted curriculum.

Use[ ] student achievement data in planning.

Evidence planning which incorporated elements of effective lesson design.

Select[ ] appropriate instructional materials to meet student needs.

**Technique**:

Demonstrate[ ] pedagogical and professional understanding and proficiency.

Teach[ ] to an objective.

Utilize[ ] instructional time effectively and monitor[ ] student learning and adjust[ ] teaching to enhance achievement.

Engage[ ] students in learning experiences that make connections between what students are learning and the practical applications of what is taught.

Assess[ ] student progress using the adopted student assessment system and professional practices.

**Student Reaction**:

[Ensure that] [s]tudents are actively engaged in learning.

[Ensure that] [s]tudents are guided and stimulated toward achievement of high standards.

(Murphy Dep. Ex. 1, PPSD 450, ECF No. 29-11.) Plaintiff's responsibilities under the EIP were articulated as follows:

1. Utilize the 6th and 7th grade Social studies curriculum in planning and preparation for daily lessons.

2. Identify learning objectives and post the daily objective for students in each lesson.

3. Maintain the pace established by the curriculum and a planned daily agenda for each class.

4. Design lessons with an opening activity, time for students to engage in the content and a summary or wrap-up.

5.  Engage students through use of accountable talk moves, turn and talk, pair-share or small groups.

6.  Group students using a variety of formative achievement data, [differentiating] instruction for varied level learners so that all students produce quality work aligned with the curriculum.

7.  Maintain student notebooks that include evaluated work, notes and student writings.

8.  Continue to use technology in lesson design to enhance students [sic] learning.

9.  Observe current 6th grade students in other content areas and other 6th/7th grade Social studies classes for use of Accountable Talk and student engagement.

10. Collect formative assessment data to guide instruction.

(Murphy Dep. Ex. 1, PPSD-000451, ECF No. 29-11.)

Those present for Vogel's EIP meeting included Pearlman, Camper, Vogel, a union representative from the Pittsburgh Federation of Teachers ("PFT"), and Kate Daher ("Daher"), a high school social studies teacher and Instructional Team Leader ("ITL") for the social studies department.  (DSMF 32, 68.)  Daher did not believe that Vogel needed to be placed on an EIP, and she expressed this view.  (Pl.'s Aff. ¶ 9, ECF No. 35-17; Keeney Aff. ¶ 9, ECF No. 35-11.)  Vogel also believed the EIP was unjustified, and he refused to sign it.  (DSMF 71-72.)  He testified that he felt the administration at Pittsburgh CAPA was being "biased and discriminatory" in placing him on an EIP because he "had been a satisfactory teacher for all these years," and the administrators were "coming in and observing [his] class saying that [he was] doing every wrong."  (DSMF 72.)  Although Vogel "felt it was [his] age, that they were looking to replace [him], and this was their method of doing it" (id.), he does not claim to have expressed his suspicion at that time.  During the meeting, Vogel inquired about what the EIP would entail, and he was informed by Pearlman that it would be a "two-year process." (Pearlman Dep. 96:1-6, ECF No. 35-2.)

On January 3, 2011, Pearlman observed Vogel's 7th grade social studies class involving a unit on India.  (DSMF 74; Murphy Dep. Ex. 1, PPSD-000457, ECF No. 29-11.)  On that day,

Vogel had posted an overarching question for the lesson and a warm-up, which required the students to identify five accomplishments of the Maurya and Gupta Empires. (Id.) Pearlman observed that it was unclear how long students had to work on the warm-up and, as a result, the warm-up ran long and students ran out of time to complete a subsequent web-search activity. (Id. at PPSD-000460.) She found that there was "no closure to the lesson so it was unclear as to what next steps would occur for students to finish the chart [they were working on]." (Id.) Pearlman recommended that Vogel consider how he could hold students more accountable to time parameters, as this was the way "to teach students about the importance of staying on task and placing a value on the subject matter at hand." (Id.) She questioned how Vogel was using formative assessments as a means of determining whether students were meeting the lesson's objective. She wrote in her post-observation conference report:

> I did not observe you writing anything down or keeping track of what students were saying and when. This became evident when not all students were contributing or being called on. Several students were called on more than once. ... Formative assessment (or in-the-moment assessments) helps you to gather data about students to determine what they do and do not know. During this class, 10 of the 19 students did not speak or were not called on at all during class.

(Murphy Dep. Ex. 1, PPSD-000460.) Pearlman recommended that Vogel improve his questioning strategies:

> Research tells us that socializing intelligences helps student's [sic] growth [sic] their knowledge, test their thinking and expand their understanding. All of this learning begins with questioning. Seven paragraphs of text were read aloud by students about three different topics ... At no time were any questions posed to the class to check for understanding, promote thinking or make connections. You made those statements for students, but did not allow students to do so. This was a missed opportunity. How can you begin to play [sic] your questions in a way that check[s] for understanding, promote[s] thinking, and require[s] students to synthesize information? ...

> The dominant talk structure in the class was IRE (Initiate, Respond, Evaluate). How can you begin to pose questions that allow students to talk to one another and move away from the teacher-student-teacher structure that is currently in place? How do you get students to engage in more accountable talk moves that hold them accountable to rigorous thinking?

(Murphy Dep. Ex. 1, PPSD-000460.)

One day after Pearlman's conference with Vogel, Camper covered his tenth period social studies class after Vogel was excused to perform coaching duties. Camper reported that no lesson plans were left for the students, no roll sheet was provided for the class, and students were directed to watch a video and record fifteen facts about it afterward. (Murphy Dep. Ex. 1, PPSD-000444, ECF No. 29-11.) Several days later, Pearlman met with Vogel to discuss his lesson design and implementation and to review procedures for occasions when he is absent. (Id.) Pearlman criticized the assignment in question as "lack[ing] detail, rigor and any specific purpose or focus related to the overarching question." (Id. at PPSD-000493.) She noted that Vogel had taught his three other 6th grade classes differently than the tenth period class that Camper had covered for him, and she reminded Vogel that "all classes should be held to the same assignments and standard of learning." (Id.)

On January 26, 2011, as part of his EIP, Vogel engaged in a peer observation of a social studies teacher at another PPSD school. Camper, Daher, and Ravi accompanied Vogel and participated in the observation. (Murphy Dep. Ex. 1, PPSD-000444, ECF No. 29-11.) On that date, the subject teacher, Karen Bruno ("Bruno"), was conducting a lesson on the Caribbean Islands and incorporated a power point presentation of pictures from her vacation to Jamaica. (Daher Aff. ¶19, ECF No. 35-8.) Although the visit was meant to provide Vogel techniques for classroom questioning and talk structures (Murphy Dep. Ex. 1, PPSD-000460), Vogel observed that Bruno lectured for twenty-five minutes and called on only those students who raised their hands, whereas he was criticized for doing these things. (Id. at PPSD-000498-000499.) Daher noted that most of the students in the class did not speak during the lesson. (Daher Aff. ¶18, ECF No. 35-8.) Vogel also noted that no objectives or overarching questions were posted, no

warm-up notebooks or stampers were used, and not every student completed the warm-up. (Murphy Dep. Ex. 1 at PPSD-000498-000499.)

On February 2, 2011, Pearlman observed Vogel's ninth period social studies class, in which students were addressing the topography and environmental features of the Caribbean. (Murphy Dep. Ex. 1, PPSD-000444, ECF No. 29-11; DSMF 74.) Pearlman noted certain areas of improvement, such as Vogel's use of popsicle sticks to randomly call on his students (and thereby hold them accountable for learning the material), a new seating arrangement designed to foster more student-to-student talk, the implementation of a warm-up that was eliciting student responses, and the use of student notebooks as a formative assessment tool. (Id. at PSD-000444, PPSD-000445.) Despite these areas of growth, Pearlman reported that Vogel still needed to show improvement in other areas, such as: making better use of instructional time by holding students more accountable to specific time parameters in class; using the popsicle sticks as a tool to help Vogel learn what students do and do not know; shifting the dominant talk structure in the classroom from teacher-student-teacher to more student-student talk; and bringing closure to the lesson. (Id. at PPSD-000445, PPSD-000466.)

Ravi conducted a formal observation on February 11, 2011, of Vogel's eighth period social studies class. (DSMF 77.) The students' warm-up on that day involved unscrambling geographic vocabulary words, which Ravi felt was a "low rigor" task having "little to do with ideas in geography." (Murphy Dep. 1, PPSD-000468, ECF No. 29-11.) (Id.) While the warm-up was going on, Ravi observed Vogel going around the room and stamping students' notebooks whether or not they had finished unscrambling all the words. (Id.) Students gave presentations about the Caribbean. Each student was given a grading rubric to complete, which would serve as an evaluation of their classmates' presentations. Ravi perceived confusion among the students

about how they were to fill out the rubric. (Id.) Toward the end of class, Vogel passed out a half sheet of paper that was meant to test the students on what they remembered from the presentations. Ravi observed that the bell rang before the students had time to complete this "exit ticket." (Id. at PPSD-000469.)

In a post-observation conference, Ravi discussed with Vogel his planning and preparation, as well as his technique. She recommended that Vogel work on creating rigorous, content-appropriate warm-ups that engage the students and get them ready for the day's lesson. (Id. at PPSD-000470.) She suggested that Vogel consult colleagues such as Daher or herself in designing the daily warm-up. (Id. at PPSD-000469, 000470.) She observed that the rubric used in the lesson did not allow credit for student creativity and originality and required the students to actually know information about Caribbean islands that they had not yet researched. Ravi suggested that a better activity would be to have each presenter supply three to five questions that the other students could answer by listening to the presentation. (Id.) She recommended that Vogel select the order of presenters with consideration to the diversity of the group, so that lesser achievers would not be discouraged by other students that set a high bar early on. (Id. at PPSD-000470.) Finally, Ravi noted that the stamping technique is meant to reward task completion and that stamping a student's notebook before the task is completed is meaningless. Ravi suggested that this technique be used only where students need motivation. (Id.)

Vogel was next observed on March 24, 2011 when Pearlman attended his eighth period 6th grade social studies class. (DSMF 74.) Pearlman noted that Vogel had improved in certain areas, such as posting an overarching question for the class to view, utilizing warm-up books and student notebooks, keeping his students engaged, and randomly calling on students by means of drawing popsicle sticks. (Murphy Dep. Ex. 1, PPSD-000474, ECF No. 29-11.) Despite these

improvements, Pearlman concluded that Vogel still needed to work on planning his lessons and holding students accountable to time parameters, as the lesson had run long and once again lacked closure. (Id.) She recommended that Vogel work on setting objectives for the lesson, as there had been no mention of the learning objective or overarching question during the course of the lesson. (Id.) Although Vogel was randomly calling on students for answers, Pearlman questioned how Vogel was keeping track of the content of the students' answers as a means of gauging their understanding. She did not observe Vogel collecting or observing homework for purposes of conducting a formative assessment. She noted that students could have failed to complete their homework and yet still captured the correct answers in class because of the manner in which Vogel had reviewed the homework assignment. (Id.) Finally, she observed that the "dominant talk structure ... continues to be teacher-student-teacher." (Id.)

Pearlman met with Vogel on March 29, 2011, to discuss her observations. (DSMF 75.) By way of assistance, she gave Vogel material to read. She suggested that Vogel observe Daher and other teachers in their practice and involve Murphy or her in a pre-lesson conference. (Murphy Dep. Ex. 1, PPSD-000475, ECF No. 29-11.) In her post-conference report, which Vogel signed, Pearlman commented:

> There seems to be a continued pattern in areas that need to be enhanced in your practice: planning and preparation, student talk and closure. These areas are ones for which we have offered suggestions and feedback, but have not seen evidence of growth. For example, there has yet to be a closure to any of the observed lessons. Additionally, there are little to no opportunities for think/pair/share or student-to-student talk in your classroom. These are two areas to focus on when observing the ITL and other colleagues.

(Id.)

On April 12, 2011, Ravi conducted a second formal observation of Vogel's world geography/archaeology class. (DSMF 77; Murphy Dep. Ex. 1, PPSD-000476-000479, ECF No.

13

29-11.)  Students completed a warm-up exercise and were asked to complete posters on different

African countries.  (Id.)  Ravi considered the poster work to be a low level task that did not make

good use of instructional time because it did not tie into the concepts being taught in that unit.

(Murphy Dep. Ex. 1 at PPSD-000477-000478.)  She reiterated her previous recommendations

that Vogel work on creating rigorous, content-appropriate warm-ups and incorporate

opportunities for daily writing.  (Id. at PPSD-000478.)   She noted that "[a]ll activities and work

should be higher-level and should push students to demonstrate their understanding of

geographic concepts in response to the overarching questions for the unit."  (Id.)

     Pursuant to Vogel's EIP, Pearlman arranged monthly meetings to monitor and discuss

Vogel's progress.  (DSMF 76; Murphy Dep. Ex. 1, PPSD-000451, ECF No. 29-11.)

Accordingly, progress meetings were held at the end of January, February, and March 2011.

(DSMF 76.)  During his April 28, 2011 progress monitoring meeting, Pearlman informed Vogel

that there was not enough evidence to support a satisfactory evaluation.  (DSMF 79.)  At Vogel's

request, Pearlman agreed to observe him one more time.  (DSMF 80.)

     Pearlman observed Vogel's sixth period social studies class on May 5, 2011.  (DSMF 74;

Murphy Dep. Ex. 1, PPSD-000480-000483.)  On that day, sixth graders were learning about East

Africa.  Pearlman acknowledged Vogel's improvement in the areas of "[p]osting of Overarching

Questions, warm-up books, students notebooks, distributing an exit ticket to students, and use of

technology."  (Id. at PPSD-000482.)   She, however, indicated that improvement was needed in

the areas of managing instructional time, setting objectives and learning intentions for the class,

conducting formative assessments to gauge students' understanding, providing closure to the

lesson, and utilizing effective questioning strategies and student talk.  (Id.) In her post-

observation conference report, Pearlman commented that "[d]uring our last two observations, I

asked how can you begin to give students specific time frames for the different tasks they are working on in class by posting this information on the board?  This did not occur during this lesson, which led to students not finishing either of the tasks you assigned them."  (Murphy Dep. Ex. 1, PPSD-000482, ECF No. 29-11.)  No mention was made of the objective or overarching question during the lesson, prompting Pearlman to ask, "What did you want the students to learn by the end of the period? And, how are students able to make real work connections to what they are studying in your class?"  (Id.)  With respect to formative assessments, Pearlman questioned how Vogel was gathering information about what students were learning and which students may need additional support.  Finally, Pearlman observed that the dominant talk structure continued to be teacher-student-teacher rather than student-to-student.  She noted that she had previously shared a think-pair-share protocol with Vogel in March 2011, and she questioned how that was being used in Vogel's lessons.  She commented that, "[s]imilar to my observation last month, students were told to work in pairs to complete a comparison chart, but only six students in the class adhered to this direction.  You even told some student who to work with but this did not occur with fidelity.  This tells me that students do not have a classroom routine for working in pairs/trios.  Why is this the case?"  (Id.)

On May 25, 2011, Pearlman assigned Vogel an "unsatisfactory" rating for the 2010-2011 school year, which was approved by Assistant Superintendent Christiana Otuwa, Ph.D. ("Otuwa").  (Murphy Dep. Ex. 1, PPSD-000447, PPSD-000511; DSMF 93.)  The materials in support of the rating included a "Chronology of Key Events" prepared by Pearlman, a copy of Vogel's EIP, copies of the Observation and Conference Reports that the District's certified evaluators had completed in connection with their observations of Vogel, copies of correspondence sent to Vogel, documentation of Vogel's monthly progress monitoring meetings,

and activity logs documenting the various forms of assistance Vogel received from various administrators and colleagues in connection with his EIP. (Murphy Dep. Ex. 1, PPSD-000439-000511, ECF No. 29-11.) The "Summary and Conclusion" page, signed by Pearlman and Otuwa, sets forth the following justification for the adverse rating:

> Mr. Vogel continues to have tremendous difficulty in the planning and preparation of lessons as they are intended, which reflect school district goals and the goals of the district's adopted curricula. Mr. Vogel posts objectives and overarching questions, but no evidence supports that students are aware of these objectives, overarching questions or learning intentions. His lessons are often incomplete in design and implementation and confusing to students. Mr. Vogel does not hold student[s] accountable to specific time parameters, and due dates are often confusing for students. Mr. Vogel has also struggled with monitoring his learners, enhancing rigorous instructional materials to meet student needs, and using data to help drive instruction. Mr. Vogel rarely helps students make connections to the different geographical areas they are studying and the practical application of what is being taught. Lessons in Mr. Vogel's class rarely exhibit higher levels of writing assignments [and] students are not instructed to write in complete sentences. When written assignments are given, very little if any student feedback is received.

(Murphy Dep. Ex. 1, PPSD-000511, ECF No. 29-11.) (Id.)

Upon receiving his "unsatisfactory" rating, Vogel expressed to Pearlman that he "didn't think it was deserved" and that he believed that it was being issued because of his age. (DSMF 94.) Vogel testified that, to the best of his knowledge, this was the first time he raised the allegation of age discrimination. (Pl.'s Dep. 99, ECF No. 29-1.) Daher also expressed concern about the rating. (DSMF 99.) Vogel unsuccessfully grieved the 2010-2011 unsatisfactory rating. (DSMF 101-102.) He did not appeal the denial of his grievance because he was informed (inaccurately) that the rating could not be appealed. (DSMF 102.)

After receiving his unsatisfactory rating, Vogel sought suggestions from Pearlman about how he could improve for the next semester. According to Vogel, Pearlman recommended some material for him to read over the summer and indicated that Vogel was working too hard, but "not ... in the right areas." (Pl. Dep. 101, ECF No. 29-1.)

In the 2011-2012 school year, Pittsburgh CAPA administrators formally evaluated Vogel on six occasions. Vogel was initially observed on September 8, 2011, by Pearlman and Murphy. (DSMF 105; Murphy Dep. Ex. 2, PPSD-000536-537, ECF No. 29-11.) Pearlman's report indicates that seven students were seated facing the windows with their backs to their classmates; she asked Vogel to visit three other classrooms and consider how he could create an environment that would facilitate more student-to-student dialogue. (Murphy Ex. 2 at PPSD-000536-000537.) Pearlman reported that the dominant talk structure continued to be IRE (Initiate, Respond, and Evaluate) and that only a few students from the middle and back rows participated. She asked Vogel to consider how he could work to ensure that more students have the opportunity to speak in class. She suggested that Vogel design a lesson that would only allow for two teacher questions with the remainder being student talk and reflection. (Id.) She suggested that Vogel post daily agendas for learning on the board in a "what, why, how" format that asks what students will be doing during the class period, why it is important in relation to the overarching unit questions, and how students will demonstrate what they have learned. (Id. at PPSD-000537.)

Vogel was formally observed again on September 14, 2011, by Michael Dreger ("Dreger"), who had replaced Ravi as the District's social studies curriculum coordinator. (DSMF 30.) Dreger's post-observation conference report reflects that Vogel and he discussed planning lessons with academic rigor. Dreger advised Vogel that all lessons should follow the format of "warm-up, main activity and summing up/closure." (Murphy Dep. Ex. 2, PPSD-000540, ECF No. 29-11.) He noted that there had been no closure to the lesson and advised Vogel that his future lessons should incorporate all three components of lesson design. (Id.)

Dreger noted that the warm-up activity had involved students simply copying down information without active intellectual engagement. He suggested a different warm-up prompt that would help stimulate student thinking and relate to the main lesson activity. (Id.) Dreger observed that the planned lesson activity was not from the core curriculum; it lacked a clear learning objective, and it involved students following a set of directions and labeling a blank grid map. Dreger advised that any future deviations from the curriculum should be "rigorous" and should support the unit's overarching questions; he also provided examples of how the lesson could have been improved. (Id.) With respect to Vogel's technique, Dreger noted that all the questions posed during the lesson had been close ended. He gave examples of more open ended questions for the lesson that he believed would relate to the overarching questions of the unit and would push students to engage in higher level thinking. (Murphy Dep. Ex. 2, PPSD-000541, ECF No. 29-11.) He found no evidence of student-to-student talk or accountable talk during the lesson and suggested a technique for improving on this technique. (Id.)

Vogel was placed on an EIP for the 2011-2012 school year on September 21, 2011. (DSMF 108-09.) The areas of stated concern were once again set forth as planning and preparation, technique, and student reaction. (Murphy Dep. Ex. 2, PPSD-000528, ECF No. 29-11.) To improve in these areas, Vogel was assigned the following responsibilities:

- Identify learning objectives and post the daily objectives for students in each lesson (What, Why and How)[.]

- Post daily agendas for learning that directly connect[ ] to learning objectives and review this agenda with students.

- Design lesson with an opening activity (warm-ups, write abouts, etc), time for students to engage in the content with their peers, and a closure that is connected to the learning.

- Develop lessons and plan questions that engage students in the learning, which results in direct student-to-student talk and limits the amount of IRE [Initiate, Respond and Evaluate] questioning directed by the teacher.

- Group students using a variety of formative achievement data and differentiating instruction for varied level learners, so that all students produce quality work aligned to the learning goals/objectives.

- Observe other 6-8 teachers and other 9-12 social studies teachers for effective lesson design specific to the principles of learning in a social studies community.

(Id. at PPSD-000529.)

Following the commencement of his second EIP, Vogel was formally observed by Pearlman on October 24, 2011. (Murphy Dep. Ex. 2, PPSD-000542-000544, ECF No. 29-11.) On that date, Pearlman documented "noticeable improvement" in the classroom environment: the walls reflected "a residue of student learning," the posters and maps on display related to the course being taught, and table groups had been arranged to facilitate a "more dialogical learning environment." (Id. at PPSD-000544.) Pearlman found evidence of positive rituals and routines, as the warm-up lesson, objective, and overarching question were all posted for the class, and students were utilizing their notebooks. (Id.) She found room for further improvement with respect to "rituals and routines," "questioning and discussion techniques," and "level of rigor." (Id.) She noted that none of the ten notebooks she examined contained teacher comments or graded notes, and she reminded Vogel to provide feedback and evaluative comments as a method of encouraging students to "expand their own thinking" and "grow their own practice as learners." (Id.) Pearlman documented that the warm-up task was not directly related to the main lesson and that the questions posed by Vogel did not tend to advance student thinking or check for their understanding about the project they were working on. (Id.) Pearlman noted that Vogel had provided his students a unit test to work on, but he had crossed out a section entitled "critical

19

thinking." (Id. at PPSD-000542.) Pearlman considered this a missed opportunity for "enhanced rigor" on the unit test. (Id. at PPSD-000544.)

Dreger conducted another formal observation on November 17, 2011. On that day, the students had spent part of their day at the opera, and Vogel began his warm-up by asking the students to write down three things they liked about the opera and three things they did not like about it. (Murphy Dep. Ex. 2, PPSD-000545, ECF No. 29-11.) Dreger felt that this warm-up activity did not engage students in learning and did not relate to the lesson's learning goals. (Id. at PPSD-000546.) Following the warm-up, Vogel's students presented public service announcements ("PSAs") that, according to Dreger, were intended to draw attention to issues related to the responsible use of nature resources. (Id. at PPSD-000547.) Dreger reported that it was "not evident" that students had completed the PSA assignment as it had been outlined in the curriculum, as "[n]ot one of the presentations answered any of [the] listed questions" students were expected to address, "nor did they demonstrate the students [sic] understanding/learning in regards to the units [sic] overarching questions." (Id.) Dreger noted that one of the presentations lasted less than thirty seconds and had no clear message, while another involved a thirty-second rap video in which the students' message was to "use fossil fuels." (Id. at PPSD-000545-000546.) Although Dreger found the students to be engaged in the task of presenting their PSAs, he considered the activity to be low level. (Id. at PPSD-000547.) He observed that, while the PSAs were being presented, the non-presenting students were supposed to be taking notes, but were not doing so. Dreger questioned what system Vogel had in place to hold the students accountable to learn from the other group presentations, and he offered suggestions about how this could be effectively done more. Dreger observed that the lesson lacked any summing-up

activity, and he reminded Vogel once again to incorporate the warm-up, main activity, and summing up components into his lesson design.

Vogel was next observed on December 19, 2011, by Murphy. On that day, Vogel was covering a lesson on Latin America, which included a video presentation. Murphy discussed student accountability with Vogel and recommended he incorporate the use of a guide with the video so that his students would be more actively engaged and Vogel would be able to assess afterward what they had learned. (Murphy Dep. Ex. 2, PPSD-000550, ECF No.29-11.) She suggested that, when questioning his students, he give them more time to formulate their answers before asking students to volunteer their answers or giving the answer to them. (Id.) Murphy observed that two African-American students did not share during the lesson, and she recommended that Vogel maintain a system for managing participation so that none of his students could opt out of the learning. (Id. at PPSD-000549-550) She observed that Vogel had issued exit tickets for extra credit and was calling out directions as the students were cleaning up and leaving the classroom. She recommended that Vogel provide closure to the lesson that makes connections to the overarching question and the lesson's activities. (Id. at PPSD-000550.)

On January 3, 2012, Pearlman conducted a formal observation of Vogel's social studies class covering the physical features of Latin America. She found evidence that Vogel had established rituals and routines with regard to students utilizing their notebooks to engage in the warm-up activity as soon as the bell rang; however, she also noted that there were no teacher comments or graded notes in the notebooks she examined, and she reminded Vogel to provide feedback and evaluative comments. (Murphy Dep. Ex. 2, PPSD-000554, ECF No. 29-11.) Although Vogel had posted the overarching question for the class, Pearlman observed that he had not posted the lesson objective or an agenda as Pearlman had previously suggested. (Id.)

With respect to questioning techniques, Pearlman noted that Vogel was still employing an IRE (Initiate, Respond and Evaluate) framework and thus limiting opportunities for student-to-student talk. (Id.) She recommended that Vogel chart student responses (i.e., make learning public) to ensure that other students record this information in their notebooks. Finally, she questioned the manner in which Vogel had adapted his warm-up, as it merely required students to list countries without providing any thinking or deep analysis. (Id.)

In early January 2012, Pearlman submitted a recommendation that Vogel be rated unsatisfactory for the 2011-2012 school year. Again, Vogel's ratings packet included a "Chronology of Key Events" prepared by Pearlman, a copy of Vogel's EIP, copies of the certified evaluators' Observation and Conference Reports, documentation of Vogel's monthly progress monitoring meetings, and activity logs documenting the various forms of assistance Vogel received from various administrators and colleagues in connection with his EIP. (Murphy Dep. Ex. 2, PPSD-000514-000569, ECF No. 29-11.) The summary and conclusion in support of the recommendation stated, in relevant part, that:

> Mr. Vogel continues to have tremendous difficulty in the planning and preparation of lessons as indicated by the "thinking through a lesson" protocol for social studies courses. His lessons are often incomplete in design and implementation. Lessons often lack the following: a well-structured warm-up, main activities that provide an agenda for student work, discussion questions that promote high level thinking and student-to-student talk, little to no differentiation, and a closure that provides formative feedback to the teacher regarding student learning. Students do not receive written feedback on their work on a regular basis and this is evidenced by the lack of student notebooks and consistent displays of student work.

(Murphy Dep. Ex. 2, PPSD-000569, ECF No. 29-11.)

Superintendent Linda Lane approved Pearlman's "unsatisfactory" rating assignment on January 12, 2012. (Murphy Dep. Ex. 2, PPSD-000524, ECF No. 29-11.) That same day, Vogel met with Pearlman, Murphy and Muehlbauer and was presented with his ratings packet. (DSMF

124.)  He expressed that he was "extremely disappointed" at the rating and believed that he had worked hard as a teacher. (Pl. Dep. 146, ECF No. 29-1.)  He believed the rating was "all because [Pearlman] was looking to get rid of [him] because [he] was the oldest person at the [middle] school." (Id. at 150.)  He claims that, after turning in his keys and badge he was escorted from the building "like some common criminal." (Id. at 148.)

Vogel's receipt of two consecutive unsatisfactory ratings functionally left him with two options:  he could file a grievance and dispute the rating, or he could resign.  Vogel ultimately chose the latter option because he did not believe that he would receive a fair hearing if he grieved the unsatisfactory rating, and he did not want to "roll the dice" and possibly forfeit his teaching certificate and his severance pay if he lost.  (DSMF 143.)

Administrative and Court-Related Proceedings

Vogel signed an EEOC Intake Questionnaire on or about December 11, 2011, prior to his second adverse rating.  (DSMF 1.)  In the questionnaire, Vogel alleged age discrimination on the part of PPSD in connection with his first "unsatisfactory" rating.  (Pl.'s Depo. Ex. 37, Ex. B to Def.'s App. to Concise Statement of Material Facts 30-37, ECF No. 29-2.)

On or about December 19, 2011, Vogel filed a Notice of Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  (DSMF 2; Ex. D to Def.'s App. to Concise Statement of Material Facts 12, ECF No. 29-4.)  Susan Dobies-Sinicki ("Dobies-Sinicki"), then manager of the PPSD's Office of Employee Relations, was responsible for coordinating cases in which administrative charges of discrimination had been filed against the School District.  (Spolar Dep. 6:17-8:3, Oct. 18, 2013, ECF No. 29-5; Dobies-Sinicki Decl. ¶2, ECF No. 29-6.)  Upon returning from holiday leave, Dobies-Sinicki forwarded the notice to legal counsel on January 4, 2012.  (Dobies-Sinicki Decl. ¶ 4; Def.'s Objections and Answers to Pl.'s

First Set of Interrog. and Resp. to Req. for Produc. of Docs., at 11, ECF No. 29-3.)  She did not

notify Pittsburgh CAPA administrators about her receipt of the notice.  (Dobies-Sinicki Decl. ¶

5.)

The EEOC issued a Dismissal of Notice of Rights on May 30, 2012.  (DSMF 11.)  Vogel

commenced this civil action in which he asserts two separate claims under the ADEA.  (Compl.,

ECF No. 1, DSMF 12.)  Count I of the complaint asserts that PPSD violated the ADEA by

issuing the two unsatisfactory ratings on account of Vogel's age.  Count II asserts that PPSD

unlawfully retaliated against Vogel when it issued the second unsatisfactory rating in response to

Vogel's EEOC charge.

On January 27, 2014, PPSD filed the pending motion seeking summary judgment on both

counts of the complaint.  Plaintiff filed his brief and supporting materials in opposition to the

pending motion in March, 2014.  PPSD filed its reply papers on April 7, 2014.  The issues raised

in the pending motion are now ripe for disposition.

## II.  Standard of Review

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party
> may move for summary judgment, identifying each claim or defense—or the part
> of each claim or defense—on which summary judgment is sought.  The court
> shall grant summary judgment if the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter
> of law.  The court should state on the record the reasons for granting or denying
> the motion.

Fed. R. Civ. P. 56(a).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a party who
> fails to make a showing sufficient to establish the existence of an element
> essential to that party's case, and on which that party will bear the burden of proof
> at trial."

*Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir.2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." (citing *Anderson*, 477 U.S. at 248; *Celotex Corp.*, 477 U.S. at 322–23)).

> [W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).  In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. *Woodside v. Sch. Dist. of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir.2001); *Doe v. Cnty. of Centre*, 242 F.3d 437, 446 (3d Cir.2001); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999).

**III.  Discussion**

A.  Count I of the Complaint

The ADEA makes it unlawful "for an employer to …discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  In Count One of the complaint, Vogel alleges that PPSD violated this provision by assigning him two unsatisfactory ratings on account of his age.

Because this age discrimination claim is based on indirect and circumstantial evidence rather than direct evidence of discrimination, the claim must be analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see O'Connell v. Associated Wholesalers, Inc.,* 558 F. App'x 286, 289 (3d Cir. 2014); *Tomasso v. Boeing Co.,* 445 F.3d 702, 704–05 (3d Cir. 2006). Pursuant to this framework, a plaintiff employee must first establish a prima facie case of discrimination by showing that (1) he is forty years of age or older; (2) the employer took an adverse action against him; (3) he was qualified for the position at issue; and (4) he was ultimately replaced by another employee "who was sufficiently younger to support an inference of discriminatory animus." *Evanoski v. United Parcel Service, Inc.,* --- F. App'x ---, 2014 WL 2958604 *2 (3d Cir. July 2, 2014) (quoting *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013); *see O'Connell,* 558 F. App'x at 289-90 (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir.1997)). If the plaintiff establishes his prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *O'Connell,* 558 F. App'x at 290 (citing *Keller*, 130 F.3d at 1108). It then becomes the plaintiff's burden to prove, by a preponderance of the evidence, that the articulated reason was a mere pretext for discrimination. Id.

At the summary judgment stage, the plaintiff can demonstrate a genuine issue of fact with respect to pretext by presenting evidence that would allow a factfinder to reasonably conclude either (i) that the reason offered by the employer is a fabrication, or (ii) that the adverse employment action was more likely than not motivated by age discrimination. *See Emmett v. Kwik Lok Corp.,* 528 F. App'x 257, 261 (3d Cir. 2013); *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994). To cast doubt on an employer's proffered reasons for an adverse employment action, it is not enough to show that the employer's decision was "wrong or mistaken, since the factual

dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Emmett,* 528 F. App'x at 261 (quoting *Fuentes,* 32 F.3d at 765. The employee must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'," *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 765), and thus "infer ... that the employer engaged in the adverse employment action for an invidious reason." Id. (citing *Fuentes*, 32 F.3d at 764).

For purposes of the pending motion, PPSD assumes that Vogel can establish a prima facie case of age discrimination. With respect to its nondiscriminatory reason, PPSD explains the issuance of Vogel's two unsatisfactory ratings by pointing to the documentation in his ratings packets as evidence that his teaching performance was unsatisfactory during the 2010-2011 and 2011-2012 school years. Accordingly, the court will focus its analysis on the final stage of the *McDonnell Douglas* analysis by considering whether Vogel has pointed to evidence sufficient to permit a reasonable inference that PPSD's articulated reason for Vogel's unsatisfactory ratings were a mere pretext for age discrimination.

Here, there is considerable evidence that PPSD employed a ratings procedure that was designed to assess teacher performance and minimize the influence of personal bias on the part of any particular evaluator. The evidence establishes that six different Pittsburgh CAPA administrators, including Pearlman, had the opportunity to observe Vogel during the time frame in question, thus ensuring a number of perspectives as to Vogel's performance. Vogel was observed, formally or informally, on at least twenty occasions during the course of the 2010-2011 and 2011-2012 school years. All the administrators who observed Vogel were state

certified to evaluate teacher performance (Spolar Dep. 29, ECF No. 29-5), and all of them documented aspects of his performance that they considered deficient, as described in the court's discussion of background facts. The evaluators' reports are detailed. They substantially corroborate one another and are supportive of Pearlman's stated reasons for the adverse ratings, as set forth in the respective ratings packets. All the evaluations were written within a time frame that was generally contemporaneous with the underlying observations. It is undisputed that Pearlman reviewed these reports, conferred with the other evaluators (DSMF 118), and submitted them as evidence supportive of an adverse rating. (Murphy Ex. 1 and 2, ECF No. 29-11.) Collectively, these facts support Pearlman's representation that her rating decision was motivated by her perception of unsatisfactory performance rather than by age.

Vogel received support during the school years in question to address the deficiency noted. Vogel was provided frequent and detailed feedback concerning performance issues. This feedback was provided verbally to Vogel during post-observation conferences with his evaluators and in Vogel's monthly EIP progress meetings with Pearlman. Written feedback occurred in the form of the evaluators' post-observation reports and the monthly EIP progress conference sheets, which Vogel signed. (See generally Murphy Ex. 1 and 2, ECF No. 29-11.) The conferences and meetings provided Vogel an opportunity to confer with his advisers and provide evidence of his own. (DSMF 119.)

During the course of the 2010-2011 and 2011-2012 school years, Vogel received technology coaching for purposes of integrating technology into his lesson plans (Murphy Dep. Ex. 1, PPSD-000499, PPSD-000501); he was encouraged to consult with his ITL or members of the administration for help with lesson planning (id. at PPSD-000469- 000470, PPSD-000475, PPSD-000508); he was provided written materials to bolster his teaching practices (Murphy Dep.

Ex. 1, PPSD-000475; Murphy Dep. Ex. 2, PPSD-000560-000561, 000565, ECF No. 29-11); he was encouraged to observe other teachers, including Daher, with respect to classroom environment and student engagement techniques (Murphy Dep. Ex. 1, PPSD-000502, PPSD-000503, PPSD-000505, PPSD-000508, PPSD-000510, ECF No. 29-11); and he was afforded opportunities to attend professional development sessions (Murphy Ex. 2, PPSD-000560, 000561, 000563).  In addition, as the court's recitation of the background facts demonstrates, Vogel's observers frequently offered specific examples of classroom practices, questions, or lesson ideas that Vogel could employ to improve his performance.

The evidence also shows that the District utilized quality-control-type measures in connection with its EIP and ratings process.  Muehlbauer testified that it was her job as executive director of Performance Management "to make sure that the [EIP] process was done correctly on the part of the school and school-based personnel and central office."  (Muehlbauer Dep. 36, ECF No. 29-9.)  Her responsibilities included monitoring the paperwork and support that was being provided to teachers and occasionally attending progress monitoring meetings to ensure that necessary support steps were being followed.  (Id.)  She reviewed ratings packets to ensure "that there are sufficient observations and that they have been done over a fair course of time and that there's more than one lens into the evaluation of a teacher's practice in a lesson." (Muehlbauer Dep. 3, ECF No. 29-9; id. at 83, ECF No. 35-5.)  One area of concern for Muehlbauer was "ensuring that principals are providing the support that has been outlined in an employee's [EIP]."  (Muehlbauer Dep. 38-39, ECF No. 29-9.)  Accordingly, she "check[ed] to see that there's been periodic meetings with the employee to inform him or her of their progress

towards meeting the expectations outlined in their improvement plan." (Id.)[4] After being checked by Muehlbauer, Vogel's ratings packets were forwarded to the District's superintendent or assistant superintendent for final approval. Beyond these measures, Vogel had the right under his collective bargaining agreement to grieve his adverse ratings, and did so (unsuccessfully) with respect to his first "unsatisfactory" rating. (Vogel Dep. Ex. 18, PPSD-2511-2512, ECF No. 29-2.) These considerations are more than PPSD to meet its burden of showing a nondiscriminatory reason for Vogel's termination.

Where, as here, multiple individuals have input into an employment decision, liability may be established under a subordinate bias or "cat's paw" theory of employment discrimination. This kind of claim allows a plaintiff to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision. *See Staub v. Proctor Hospital,* --- U.S. ---, 113 S. Ct. 1186, 1190 (2011) (discussing a "cat's paw" theory in the context of the Uniformed Services Employment and Reemployment Rights Act). In order to successfully employ a subordinate bias theory, however, the plaintiff must produce evidence of impermissible animus on the part of the subordinate. *See Tucker v. Thomas Jefferson Univ.,* 484 F. App'x 710, 713 (3d Cir. 2012) (plaintiff could not pursue claim of racial employment discrimination under a subordinate bias theory where there was no evidence in the record that plaintiff's supervisor was racially biased). No such showing has been made in this case; in fact, the record is devoid of any direct evidence of age-related animus or even stray age-related

---

[4] The record shows that Muehlbauer recommended that two unsatisfactory ratings be overturned relative to the school year 2010-2011 based on concerns expressed by a representative of the teacher's union. (Ex. 18 to Pl.'s App. to Concise Statement of Material Facts, ECF No. 35-18.) Although the union also sought to overturn Vogel's unsatisfactory rating, Muehlbauer did not recommend that his rating be disturbed because she felt that he received "a tremendous amount of support, but ultimately did not meet expectations relating to creating rituals and routines in the classroom, student engagement, and using student data to plan groups." (Id.)

comments on the part of the relevant administrators. Although Vogel appears to view Pearlman as the most culpable actor, he has not proffered any evidence which is suggestive of age animus on her part. At most, Vogel asserts that he raised age-related issues himself in Pearlman's presence. He alleges, for example, that, during the 2010-2011 school year, he mentioned to Pearlman on two occasions "how old [he] was and that the stress of working 12-16 hours a day was taking a toll on [him] physically." (Pl.'s Aff. ¶ 58, ECF No. 35-17. ) According to Vogel, "[s]he said she understood and told me not to let it stress me out." (Id.) Vogel also alleges that, upon receiving his first "unsatisfactory" rating in May 2011, he expressed his belief that the rating was age related. Even accepting these allegations as true, however, they do not advance Vogel's case because they are not indicative of any age-related animus on Pearlman's part.

To the extent Vogel's ADEA claim focuses on Pearlman as the culpable decision-maker, Vogel does not explain why numerous other certified administrators also documented performance deficiencies that substantially corroborate Pearlman's concerns. In his deposition, Vogel opined that Dreger, Jones, and Murphy were "just following Pearlman's orders" (Pl.'s Dep. 63, 118, ECF No. 29-1), but there is no evidence in the record to support this conclusion. Indeed, when asked what led him to believe that "this was a top down principal telling observers what to do," Vogel admitted that he could "just speculate, that is all." (Id. at 64.) As for Ravi, Vogel testified that she was highly prejudiced against him because "[s]he wanted my job, and she told [him] that." (Id. at 72; DSMF 87.) Even if Vogel's assertion about Ravi is credited, it supports an inference of animus wholly unrelated to Vogel's age and is therefore not helpful to his case.

Vogel's age discrimination claim is undermined by statistical evidence in the record concerning the composition of Pittsburgh CAPA's staff and the issuance of adverse ratings

during the relevant time period. At all times during the three school years spanning 2009-2010 through 2011-2012, PPSD employed between fifty-three and sixty-eight certified teachers at Pittsburgh CAPA. (DSMF 151, 157, 163.) During that time frame, at least thirty-six of the school's certified teachers were age forty or older; at least twenty-three teachers were age fifty or older, and at least nine were older than Vogel.[5] (DSMF 151-152, 157-159, 163-65.) Over the course of those three school years, a total of seven Pittsburgh CAPA teachers were placed on EIPs. (Ex. C to Def.'s App. to Concise Statement of Material Facts at 4-10, ECF No. 29-3.) Three of those seven teachers – namely, L.M. (born 1950); C.C. (born 1951); and L.C. (born 1951) – were older than Vogel; however, none of these individuals suffered an adverse employment action as a result of consecutive "unsatisfactory" ratings. (Id.) L.M. was on an EIP and received her first "unsatisfactory" rating in the 2009-2010 school year but, according to PPSD's records, she was not placed on an EIP or given an adverse rating the following school year. (Id. at 6.) C.C. was placed on an EIP during the 2010-2011 school year and was initially given an "unsatisfactory" rating, but that rating was later overturned and changed to a "below average." (Id. at 6; Ex. 18 to Pl.'s App. to Concise Statement of Material Facts, PPSD-001339, ECF No. 35-18.) The following year, C.C. was placed on an EIP and earned a "satisfactory" rating. (Ex. C to Def.'s App. to Concise Statement of Material Facts at 9, ECF No. 29-3.) L.C. was placed on an EIP and rated "unsatisfactory" for the 2010-2011 school year; however, the

---

[5] Vogel alleged that he had the most seniority of all the teachers in grades 6-8 at Pittsburgh CAPA and that his placement on an EIP is therefore indicative of age discrimination. However, the record is clear that Pittsburgh CAPA serves both middle school and high school students in grades 6 through 12. Because Pearlman administers staff in all those grades, it is appropriate to evaluate her actions as they relate to the school as a whole. Plaintiff cannot buttress his case by cherry-picking his preferred comparators and confining his analysis to middle school teachers alone. See Simpson v. Kay Jewelers, 142 F.3d 639, 646-47 (3d Cir. 1998)(the plaintiff could not "pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she.").

following school year she, like C.C., was placed on an EIP and earned a "satisfactory" rating. (Id. at 6, 9.)  Thus, several teachers who were older than Vogel were able to achieve satisfactory status after initially being placed on EIPs.  In fact, during each of the three school years that Vogel taught at Pittsburgh CAPA, there were at least seven other teachers who were older than Vogel who were not placed on EIPs at all.  (Id. at 4-10.)  In the school year 2009-2010, eighteen of the nineteen teachers who were older than Vogel were not placed on an EIP.  (Id. at 4; DSMF 155.)  This evidence stands in stark contradiction to Vogel's theory that EIPs were used as a means of weeding out older employees.[6]

Finally, there's no "comparator evidence" in the record which can reasonably support an inference of age discrimination.  Through his discovery responses, deposition testimony, and affidavit, Vogel identified five younger teachers at Pittsburgh CAPA whom he believes were similarly situated to himself,  but were more favorably treated.  These individuals include:  (i) S.E., a middle school math teacher born in 1974 (DSMF 144, 145); (ii) I.R., a middle school science teacher born in 1976 (id.); (iii) E.Y., a middle school English teacher born in 1962 (DSMF 147); (iv) K.A., a middle school English/ELA and social studies teacher born in 1965 (DSMF 148); and (v) A.B., a middle school Spanish teacher born in 1971 (DSMF 148).

Vogel asserts that S.E., I.R. and E.Y. "were permitted to use teaching methods that [Plaintiff] was not.  (Pl.'s Aff. ¶ 4, ECF No. 35-17.)  Specifically, he claims "[t]hey called on

---

[6] The evidence also shows that mere placement on an EIP was not in itself an adverse employment action leading inexorably to a loss of employment.  Although seven of Pittsburgh CAPA's certified teachers were placed on EIPs between 2009-2010 and 2011-2012, only Vogel and one other individual younger than himself received consecutive "unsatisfactory" ratings.  (Ex. C to Def.'s App. to Concise Statement of Material Fact at 4-10, ECF No. 29-3.)  Of the remaining five teachers who were placed on EIPs, one separated from Pittsburgh CAPA on a voluntary basis after his first unsatisfactory rating and four were able to obtain satisfactory ratings by the following year.  This is roughly in line with the testimony of PPSD witnesses who testified that approximately fifty percent of the teachers placed on EIPs are able to continue teaching within the District the following year, while the other fifty percent separate on either a voluntary or involuntary basis.  (See Spolar Dep. 40, ECF No. 43-6; Muehlbauer Dep. 31-32, ECF No. 35-5.)  Thus, Vogel's placement on an EIP cannot reasonably be construed as an adverse action that was destined to result in his involuntary separation from employment.

students that raised their hands, used IRE [Initiate, Respond and Evaluate] questioning methods and didn't have to put formal assessment comments for warm-ups." (Id.) Vogel sat in on S.E.'s class once for his own benefit as part of his EIP. (Pl. Dep. 157:9-19, ECF No. 29-1.) He sat in on I.R.'s class twice in his capacity as ITL. (DSMF 146; Pl. Dep. 159:11-20, ECF No. 29-1.) It is unclear from the record in what capacity Vogel had the opportunity to observe E.Y.'s class. Vogel identified S.E., K.A., and A.B. as teachers who were "not given unsatisfactory ratings, despite engaging in the same teaching methods, teaching children whose test scores were lower, and failing to completely follow the standard curriculum." (DSMF 148.) Vogel observed K.A.'s class on one occasion as part of his EIP. (Pl. Dep. 91:5-24, ECF No. 43-3) He states that he observed A.B.'s Spanish class or covered it on at least five occasions. According to Vogel, the curriculum A.B. teaches is "not strong at all," and A.B. "[was] allowed to show movies all of the time", but was able to justify this because the movies are in Spanish. (Pl. Dep. 185:16-186:19, ECF No. 29-1.) Vogel asserts that A.B. deviated from the District's curriculum, failed to display student work, and did not group his pupils for student –to–student talk. (Pl.'s Aff. ¶ 4, ECF No. 35-17.)

There is insufficient foundational evidence of record to support the conclusion that these younger individuals are similarly situated to Vogel. Against the detailed record that PPSD proffered relative to Vogel's performance during the 2010-2011 and 2011-2012 school years, Vogel offers only anecdotal observations or conclusory opinions about the performance deficiencies and techniques of his younger colleagues. Vogel, however, is not certified to evaluate other teachers, and he had limited opportunity to observe his putative comparators, with the possible exception of A.B. Because he does not speak Spanish (Pl. Dep. at 187:8-12), it is not clear how Vogel is positioned to meaningfully evaluate A.B.'s curriculum. Vogel failed to

proffer any evidence that state certified evaluators made similar observations with respect to these younger teachers, or that Pearlman was aware of those observations. Lastly, it is undisputed that personnel files are kept at the District's central office, not within the school (DSMF 150), and there is no evidence in the record to suggest that Pearlman was aware of the ages of Vogel's comparators, as opposed to their years of service. (Pearlman Dep. 72-73, ECF No. 29-7.) Under these circumstances, no reasonable jury could conclude that the younger teachers identified by Vogel were being treated more favorably than Vogel because of their age.

In an attempt to withstand summary judgment, Vogel points out aspects of the record which he believes "calls into question the consistency, the accuracy, and the fairness of the [ratings] process." (Pl.'s Br. Opp. Summ. Judg. 15, ECF No. 33.) None of these proffers supports a tenable inference that the EIP process was a sham or that Pearlman fabricated her justification for the adverse ratings.

For example, Vogel attempts to impugn the legitimacy of the ratings process by suggesting that Pearlman denied him an adequate opportunity to demonstrate improvement under his EIP. This argument is based on evidence that, at the time of Vogel's initial EIP meeting in December 2010, Pearlman informed him that it would be "a two-year process." (Pearlman Dep. 95:18-96:10, ECF No. 35-2.) Vogel concludes that, as a result of Pearlman's representation, "there should have been no final determination as to [his] first EIP until at least the end of the school year 2011-2012, i.e. May or June, and arguably not until the time frame of December 2012, which would have been two years from the point of his being placed on the EIP in December 2010." (Pl.'s Br. Opp. Mot. Summ. Judg. 6, ECF No. 33.) He posits that Pearlman's act of "jumping the gun" by prematurely recommending the second unsatisfactory rating is

contrary to the stated purpose of the EIP (i.e., supporting teacher growth and improvement) and is indicative of a discriminatory intent. (Id. at 7.)

Vogel's argument is untenable on this record. For one, the applicable collective bargaining agreement between PPSD and Vogel's union clearly contemplates that teacher ratings would occur on an annual basis. (Ex. D to Def.'s App. to Concise Statement of Material Facts, PPSD-000034, ECF No 29-4.) As principal of Pittsburgh CAPA, Pearlman could not have unilaterally overridden the terms of that agreement on behalf of the District by establishing a new time frame for ratings. Thus, there is no basis for concluding that Pearlman could have deferred her rating on the first EIP in the manner Vogel suggests. In addition, the record does not support Vogel's contention that the accelerated issuance of the second adverse rating prior to the end of the 2011-2012 school year contradicted District policy. Vogel's collective bargaining agreement provided that a second, consecutive unsatisfactory rating could be issued on an accelerated basis (see Ex. D to Def.'s App. to Concise Statement of Material Facts at 3, PPSD-000034, ECF No. 29-4), and this was understood by union representatives to mean four months from the beginning of the school year. (Id. at 8, PPSD-001791.) Pennsylvania law recognizes that a valid cause for termination includes "unsatisfactory teaching performance based on (2) consecutive ratings of the employee's teaching performance that are to include classroom observations, not less than four (4) months apart, in which the employee's teaching performance is rated as unsatisfactory." 24 PA. STAT. §11-1122(a). Plaintiff in his December 11, 2011 EEOC Intake Questionnaire acknowledged that he was "being given this academic year to 'improve' [his] performance," but "as a result of the [May 2011] unsatisfactory rating…, [he could] be terminated at the end of this semester." (See Vogel Dep. Ex. 37 at V0005, ECF No. 29-2 at 35.) Finally, PPSD produced unrebutted evidence that, in December 2011, it identified those teachers

who were expected to receive a second unsatisfactory rating the following month, and principals throughout the District met on January 12, 2012, with all teachers who were slated to receive an unsatisfactory for the first semester of the 2011-2012 school year.  (DSMF 122; Ex. D to Def.'s App. to Concise Statement of Material Facts, PPSD-001264-1267, ECF No. 29-4; Dobies-Sinicki Decl. ¶8, ECF No. 29-6.)  In light of these facts, the timing of Vogel's second adverse rating cannot reasonably be viewed as evidence of discriminatory animus.

Vogel suggests that the EIP was not a genuine plan of support because the terms of the plan were amorphous and ever changing.  As an example, he contends that Pearlman initially encouraged him to expand the number of students who are engaging in class discussion by drawing popsicle sticks with names on them; later, he claims, he was criticized by Pearlman for using this method in her February 2, 2011 post-observation report.  (Pl.'s Aff. ¶ 15.)  These events cannot reasonably be interpreted as evidence of a sham EIP process.  The record shows that Pearlman acknowledged Vogel's use of popsicle sticks as method for "more equitably" calling on students, and she documented this in her post-observation report as positive evidence of his growth.  (Murphy Ex. 1, PPSD-000446.)  Elsewhere in her report, Pearlman noted that "[w]hile Mr. Vogel was pulling Popsicle sticks 7-8 different students were raising their hands to be called on or recognized."  (Id. at PPSD-000464.)  Pearlman explained that the point of using popsicle sticks, as opposed to calling on students who raise their hand, was to avoid simply calling on the students who "typically [know] the answer" (Pearlman Dep. 49, ECF No. 35-2) and to involve more students on a random basis as a means of assessing whether various students are learning the subject matter.  (Id. at 48-49.)  Pearlman noted that the popsicle sticks were simply one recommended strategy as an "entry level" means of assessing student learning.  (Id. at 49.)  She expressed disappointment that Vogel "never went any deeper or higher than that to

really gauge student learning beyond the randomness of the Popsicle sticks." (Id.) Pearlman testified:

> One of the practices that we [were] working on with Mr. Vogel was to not always feed into the students who knew the right answers. So the culture in a classroom for good teachers is to really think about how you tell students that.

> So when I was a classroom teacher, we had a no hands up rule. It was very common as a teacher of English and language that I wanted students to feel like their answers were valid regardless of how high they jumped or how far their hand went. That was not the culture that was established as a routine in Mr. Vogel's classroom as much as we tried to work with him on that.

(Pearlman Dep. 52-53, ECF No.43-1.) Pearlman testified that her notation of hands being raised "meant that there was still some work to do. If students knew that the way they got called on was to have a Popsicle stick identify them to share an answer, perhaps hands would not have been going up with such eagerness." (Id. at 53.) No inference of a sham evaluation process can be drawn from the foregoing evidence.

In a similar vein, Vogel suggests that Pearlman "moved the goal posts" of his EIP by raising the issue of "talk structure" in relation to her May 5, 2011 observation. (Pl. Aff. ¶ 24, ECF No. 35-17.) As PPSD points out, however, the issue of "talk structure" had been raised by Vogel's evaluators on many occasions in the past, and it related to administrators' efforts to encourage Vogel to move away from a lecture-style presentation and move toward student-to-student discussions. (See Def.'s Resp. to PSMF 137.) The evidence cited does not support Vogel's theory that Pearlman purposefully altered the terms of his EIP in an effort to ensure an "unsatisfactory" rating.

Vogel insists that the requirements of his EIP were incomprehensibly vague. He states that he was "provided no specificity in conversations regarding 'using achievement data planning'" (Pl's Aff. ¶ 8, ECF. No. 35-17), and never received a "specific explanation as to how

[he could] demonstrate a "pedalogical" [sic] or professional understanding and proficiency."

(Id.)  The suggestion that District administrators left Vogel floundering in the dark in an effort to orchestrate his termination is belied by the record of support that he received throughout his last two school years at Pittsburgh CAPA.  As was previously discussed, Vogel received regular feedback concerning very specific steps that could be taken to improve his teaching practices. He had regular meetings with his supervisors and an opportunity to request further support or clarification as needed.  Vogel's assertion that the District should have afforded him more guidance is insufficient to establish that the EIP was used as a tool for his termination.

Much of Vogel's testimony consists of scattershot challenges to various aspects of the evaluators' post-observation reports, which he characterizes as "incorrect" or "blatantly wrong." (Pl.'s Br. Opp. Summ. Judg. 15, ECF No. 33.)  Generally, however, these challenges involve conclusory opinions or allegations evidencing nothing more than Vogel's personal disagreement with his various evaluators' professional judgment.  For example, Vogel takes issue with Pearlman's criticism in her January 5, 2011 report that ten out of nineteen students did not speak during class.  According to Vogel, that level of participation "is average for many lessons depending on the lesson."  (Pl.'s Aff. ¶ 13, ECF No. 35-17.)   However, Pearlman's larger point, as evidenced by her report, is that Vogel was calling on the same students more than once and thereby limiting his ability to assess whether the other, nonspeaking students in the class were understanding the lesson material.  (Murphy Ex. 1, PPSD-000460, ECF No.29-11.)  While Vogel may believe that lesser student participation is acceptable, his disagreement with Pearlman in this regard does not establish that she was fabricating her stated concern.  To warrant an inference that an employer's state reason is "unworthy of credence" under *Fuentes,* 32 F.3d at 765, a plaintiff "must show, not merely that the employer's proffered reason was wrong, but that it was

so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997).

Similarly, Vogel takes issue with the criticism that his lessons consistently lacked closure. He contends that he frequently closed his lessons the following day, and he faults Pearlman for not accepting his invitation to return to his classroom the next day to witness the closing activity. (Pl.'s Aff. ¶¶19-20.) But as Murphy and Dreger testified, the administrators' criticisms were rooted in their belief that lesson plans should be concluded in one day, with closing activities occurring at the end of the class period, so that the teacher can assess whether students understood the lesson and thus plan appropriately for the next day. (Dreger Dep. 21-22, ECF No. 35-7; Murphy Dep. 59-61, ECF No. 29-10.) Vogel's beliefs to the contrary do not suggest insincerity on the part of his evaluators.

Vogel also disputes the criticism that his lessons should have been centered around more student-to-student talk, as opposed to lecturing or IRE (Initiate, Respond, and Evaluate). (Pl.'s Aff. ¶ 24.) As he acknowledged in his deposition, "[p]art of Ms. Pearlman's problem with me was that … I like to lecture and talk to the students and teach. … She doesn't like that. She wants them to learn on their own." (Pl. Dep. 69, ECF No. 29-1.) Whereas Pearlman believes that students benefit from peer conversation and socialized learning, Vogel believes that the District's curriculum "requires the presentation of materials to the students by the teacher." (Pl. Aff. ¶24.) Again, the evidence supports a disagreement between Vogel and Pearlman in matters of professional judgment, but it does not support an inference that administrators were fabricating their concern about Vogel's teaching practices.

To the extent Vogel points to more factual disputes in the record, such as whether he regularly posted student work or overarching unit questions, these involve discreet items that fail

to establish a genuine dispute relative to the issue of pretext. *See Subh v. Wal-Mart Stores East, LP,* C.A. No. 07-479, 2009 WL 866798 *10 (D. Del. Mar. 31, 2009)("[T]he 'mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)(emphasis in the original). When Vogel's submission excluding his conclusory allegations, are viewed against the record as a whole, they do not support a reasonable inference that the various District administrators were dishonest in their evaluations of Vogel's performance or that unsatisfactory performance "could not have been the …real reason" for his adverse rating. *Keller,* 130 F.3d at 1109.

In challenging the legitimacy of his EIP and ratings process, Vogel relies heavily on the testimony of Daher. Her testimony, however, largely consists of conclusory statements or opinions that broadly deny the deficiencies reported by Vogel's evaluators without sufficient foundational support.

Daher alleges, for example, that she has observed Vogel and found nothing about his teaching style that justified his placement on an EIP. (Daher Aff. ¶¶ 10, 12, ECF No. 35-8.) "Generally speaking," she found the criticisms lodged against Vogel "to be specious or otherwise criticisms that could at any time be leveled at any teacher depending upon the circumstances of the particular observation on a given day..." (Id. ¶ 9.) "At all times relevant," she opines, "the standards being set for Mr. Vogel through the EIP process were ... unrealistic, and for the most part constituted a series of ever-changing, vague, amorphous criticisms..." (Id. ¶ 10.) She views the criticisms of Jones, Dreger, Ravi, Camper, Murphy, and Pearlman as "more related to the curriculum, rather than to Mr. Vogel's teaching ability." (Id. ¶ 13.) She considers the criticisms

related to Vogel's interactions with students to be inaccurate because she found Vogel's teaching to be "remarkable" and his interaction with students "particularly impressive considering he was teaching middle school." (Id. ¶ 15.) She opines that the Lewis and Clark film that Vogel showed was "particularly appropriate," and one she would have shown to her own students. (Id. ¶ 16.) She asserts that Vogel's "lesson plans specifically followed the curriculum" (id. ¶22), and she considers him "one of the better teachers, that provided interactions with students relating to making connections to geographic areas, or related applications depending upon the curriculum." (Id. at ¶24.) She asserts that "[Plaintiff] established routines, warm-ups and notebook checks, as appropriate." (Id. ¶ 31.) She also asserts that "[t]he claims that Mr. Vogel struggled in effective lessons, failed to hold students accountable, failed to engage students, or did [not] use student achievement data in his planning in the 2011-2012 EIP are simply not true." (Id. ¶ 28.)

Daher's personal opinions concerning Vogel's performance as a teacher and her general disagreement with the criticisms lodged against Vogel do not support the existence of a genuine issue of material fact with respect to pretext. Daher's position at Pittsburgh CAPA was not administrative, and she was not certified to conduct teacher evaluations; rather, she was Vogel's colleague, a member of his same bargaining unit, and a union representative. (Daher Dep. 7, 117, ECF No. 43-2; id. at 38, ECF No. 35-4; Spolar Dep. 29, ECF No. 29-5; Pearlman Dep. 161-62, ECF No. 29-7.) While Daher claims to have familiarity with Vogel's teaching style in her capacity as the social studies ITL, she does not claim to have been present in Vogel's classroom on the days when the formal observations were conducted. (Daher Dep. 136-37, ECF No. 43-2.) Although Pearlman considers Daher a highly skilled teacher, her role as an ITL was to support Vogel in a nonevaluative fashion. (Pearlman Dep. 161-62, ECF No. 29-7.) Courts have recognized that "[a] co-worker's opinion is not alone sufficient to establish that the reasons for

42

an employer's adverse action were pretextual." *Oliver v. Clinical Practices of Univ. of PA*, 921 F. Supp. 2d 434, 450-51 (E.D. Pa. 2013) (citing *Martin v. Health Care & Ret. Corp.*, 67 F. App'x 109, 113-14 (3d Cir. 2003)); *see Javornick v. United Parcel Service, Inc.*, Civil Action No. 07-0195, 2008 WL 4462280, *3 (W.D. Pa. Sept. 29, 2008) (noting that a party "cannot oppose summary judgment by offering statements of mere belief or opinion" and that co-workers' "conclusions that [the plaintiff] should not have been disciplined, or that some other employee should have been disciplined are nothing more than such impermissible opinion testimony"). Daher's opinion testimony is therefore of little probative value to the extent it is admissible at all.[7]

Finally, Vogel proffers evidence from a number of parents, students, and fellow teachers who generally attest to his professional competency. He submits the affidavit of Matthew Thompson ("Thompson"), a 7th and 8th grade social studies teacher at Pittsburgh CAPA during the 2011-2012 school year. (Thompson Aff. ¶ 2, ECF No. 35-9.) Thompson attests that Vogel successfully mentored him as a social studies teacher. (Id. ¶¶ 3-5.) Vogel submits affidavits from a number of concerned parents who supported Vogel and felt he was one of the better teachers at Pittsburgh CAPA. (*See generally* Schwager Aff., ECF No. 35-12; Yoffee Aff., ECF No. 35-13; Pierce Aff., ECF No. 35-14; Goddell Aff., ECF No. 35-15; Finkelstein Aff., ECF No. 35-16.) Also included are a packet of emails and correspondence from parents, students, and

---

[7] Vogel submitted the affidavit of William Hileman, a staff representative with the Pittsburgh Federation of Teachers who handled Vogel's grievance with respect to his first "unsatisfactory" rating. (Hileman Aff. ¶¶ 2-3, ECF No. 35-10.) Hileman's affidavit vaguely alludes to inconsistent statements which Pearlman allegedly made during the grievance hearing and which Hileman pointed out to the hearing officer "in vain." (Id. ¶8.) It recounts the various arguments which Hileman raised on Vogel's behalf in connection with grieving the first adverse rating – arguments which are essentially the same as those raised by Vogel and Daher in this litigation. (Id. ¶¶ 9-13.) The court considered Hileman's affidavit, but finds nothing in it which can support the existence of a genuine issue of material fact relative to pretext.

teachers to the District's superintendent which generally express support for Vogel's character and abilities and disagreement with the District's actions. (Ex. 19 to Pl.'s App. to Concise Statement of Material Facts, ECF No. 35-19.)

Even accepting this evidence at face value, it does not advance Vogel's case because the considerations cited by the various affiants and supporters are not the same considerations on which PPSD administrators relied in evaluating Vogel's teaching skills. At most, this kind of evidence may support a finding that the District made a poor decision in terminating Vogel, but it does not evidence insincerity on the part of the Pearlman or the other evaluators. *See Emmett v. Kwik Lok Corp.,* 528 F. App'x 257, 261 (3d Cir. 2013) (To cast doubt on an employer's proffered reasons for an adverse employment action, it is not enough to show that the employer's decision was "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." )(citing to *Fuentes v. Perskie,* 32 F.3d at 765).

In sum, there is a substantial amount of evidence or other factors supporting the District's assertion that Vogel was assigned an "unsatisfactory" rating because of poor performance. This evidence includes: (i) the detailed evaluations that were submitted by Jones, Camper, Pearlman, Ravi, Murphy, and Dreger and incorporated into the ratings packets; (ii) the generally consistent and corroborative nature of the evaluations; (iii) the support and feedback which Vogel received throughout his EIP process; (iv) the lack of any direct evidence of age-related animus; (v) the fact that several Pittsburgh CAPA teachers who were older than Vogel were either successfully rehabilitated through their EIP or never placed on an EIP at all; (vi) and the lack of evidence that younger comparators were treated more favorably than Vogel.

In light of the foregoing considerations, Vogel did not adduce sufficient evidence for a reasonable jury to find that PPSD's stated reason for his adverse ratings is "so plainly wrong that it cannot have been [the District's] real reason." *Keller,* 130 F.3d at 1109. Because Vogel failed to demonstrate the existence of a genuine issue of material fact relative to pretext, summary judgment will be entered with respect to Count I of the complaint.

B. Count II of the Complaint

Count II of the complaint asserts a claim for unlawful retaliation. Vogel claims that, after he filed a charge of age discrimination with the EEOC in December 2011 relative to his first "unsatisfactory" rating, PPSD retaliated against him by issuing the second unsatisfactory rating in January 2012. (Compl. ¶¶ 47-51.) This claim implicates § 4(d) of the ADEA which, in relevant part, makes it unlawful:

> for an employer to discriminate against any of his employees … because such individual … has opposed any practice made unlawful by this section, or because such individual … has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. §623(d).

Like his age discrimination claim in Count I, Vogel's retaliation claim in Count II is governed by the *McDonnell-Douglas* framework previously discussed. *See, e.g., Emmett v. Kwik Lok Corp.,* 528 F. App'x 257, 262 (3d Cir. 2013) ("Emmett's retaliation claim under the ADEA … is likewise governed by the *McDonnell Douglas* framework."); *Fasold v. Justice,* 409 F.3d 178, 188 (3d Cir. 2005)("In the absence of direct evidence of retaliation, retaliation claims under ... the ADEA[ ] … typically proceed under the *McDonnell Douglas* framework.") (citing cases) (internal footnotes omitted). To establish a prima facie case of retaliation under the ADEA, a plaintiff must show: "'(1) protected employee activity; (2) adverse action by the employer either

45

after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997)).

PPSD contends that Vogel's retaliation theory, as pled in the complaint, cannot survive summary judgment because, as a matter of law, there is insufficient evidence to support a causal connection between Vogel's initiation of administrative proceedings and the issuance of the second unsatisfactory rating. Dobies-Sinicki, then manager of PPSD's Office of Employee Relations, received Vogel's December 19, 2011 Notice of Charge of Discrimination and forwarded it to legal counsel on January 4, 2012 without ever having notified Pittsburgh CAPA administrators about the discrimination charge. (Dobies-Sinicki Decl. ¶¶ 2-5, ECF No. 29-6.) Nothing in the record contradicts Dobies-Sinicki's declaration in this regard or otherwise suggests that PPSD or Pittsburgh CAPA administrators were on notice about the administrative proceedings prior to January 12, 2012, when Vogel was provided his second "unsatisfactory" rating packet. In fact, the record contains documentation indicating that, even before Vogel's initiation of EEOC proceedings, he had been identified as one of many candidates slated for a possible early exit. (*See* DSMF 122; Ex. C to Def.'s App. to Concise Statement of Material Facts 4-7, ECF No. 29-4.) Any possible inference that Vogel's second unsatisfactory rating was issued in response to his EEOC filing is further dispelled by Dobies-Sinicki's assertion that January 12, 2012, was the day that all principals throughout PPSD issued their unsatisfactory ratings for the Fall 2011 semester. (Dobies-Sinicki Decl. ¶ 8 ("District-wide, on January 12, 2012, principals met with all teachers slated to receive an unsatisfactory for the first semester of

the 2011-2012 school year.").)  Based on the foregoing uncontested facts, Vogel cannot maintain his retaliation claim as it is pled in Count II of the complaint.

During the course of discovery, however, Vogel modified his theory of retaliation.  He testified in his deposition that he had complained of age-related discrimination in connection with receiving his first unsatisfactory rating in May 2011.  Vogel now asserts that his second unsatisfactory rating was issued in retaliation for his May 25, 2011 "complaint" of age discrimination in relation to the first adverse rating.  PPSD objects that this theory was never advanced before the EEOC and, as a result, cannot be pursued now.

Before bringing a federal employment discrimination action under the ADEA, a plaintiff must file a charge of discrimination with the EEOC.  *Kosakoski v. PNC Financial Serv. Group, Inc.,* Civil Action No. 12-cv-00038, 2013 WL 5377863, *at 11 (E.D. Pa. Sept. 26, 2013) (citing *Thompson v. Keystone Human Servs.*, Civ. No. 1:09-CV-2558, 2012 U.S. Dist. LEXIS 15200, at *15, (M.D. Pa. Feb. 7, 2012)).  "The purpose of the administrative exhaustion requirement is to 'put the EEOC on notice of the plaintiff's claims and afford it the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court.'"  *Id.* (quoting *Thompson,* 2012 U.S. Dist. LEXIS 15200, at *15).

The "'parameters of the civil action'" in federal court are defined by the scope of the EEOC charge.  *Kosakoski,* 2013 WL 5377863, at *11 (quoting *Butterbaugh v. Douglas*, 479 F. Supp. 2d 485, 497 (W.D. Pa. 2007)).  An action alleging violations of the ADEA must therefore "'fall fairly within the scope of the prior EEOC complaint or the investigation arising therefrom.'"  *Id.* (quoting *Butterbaugh, supra*, at 497).  To determine the "scope" of the charge, a court must consider the extent of the investigation that "'can reasonably be expected to grow out of the [EEOC] charge[s].'"  *Hicks v. ABT Assoc., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978) (quoting

*Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 399 (3d Cir. 1976); *Howze v. Jones &*
*Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984) ("[A] district court may assume
jurisdiction over additional charges if they are reasonably within the scope of the complainant's
original charges.").

In this case, the alleged act of retaliation occurred on January 12, 2012. Vogel first raised
this issue with the EEOC in his January 18, 2012 Charge of Discrimination. In that document,
Vogel asserted that "[o]n or about January 12, 2012, I was discharged from my position, in
retaliation *for filing this charge with the United States Equal Employment Opportunity*
*Commission.*" (Ex. B to Def.'s App. to Concise Statement of Material Facts 38, ECF No. 29-2
(emphasis added).) In May 2012, Vogel's counsel sent the EEOC a five-page letter setting forth
additional facts and legal argument in response to PPSD's position statement. (*See* DSMF 10;
Ex. D to Def.'s App. to Concise Statement of Material Facts 14-18, ECF No. 29-4.) In that
correspondence, Vogel's counsel reiterated and expounded on the theory that Vogel's forced
resignation was the result of his filing of the EEOC claim. Among other things, counsel noted
that "the decision to terminate was made by the <u>exact</u> individual who was listed as a
discriminating part in [Plaintiff's] EEOC Charge," and the "termination occurred merely five (5)
days after the likely receipt [by PPSD] of the notice of [the EEOC] complaint." (Ex. D to Def.'s
App. to Concise Statement of Material Facts 16, ECF No. 29-4 (emphasis in the original).)
Counsel posited that "[t]he temporal proximity in this situation is certainly suggestive of
retaliation for the filing of Mr. Vogel's EEOC Charge." (*Id*.) She concluded that PPSD's
"flagrant violation of Mr. Vogel's rights as a tenured teacher … would not have occurred but for
his EEOC Charge, and Respondent's notice thereof." (*Id*. at 17.) No mention is made in these
documents of any theory of retaliation based on comments that Vogel allegedly made at the time

of his first unsatisfactory rating in May 2011. Vogel framed his retaliation claim in this litigation around the theory that *the EEOC proceedings* were the triggering event for his forced resignation.

In light of the foregoing, the court could conclude that Vogel's revised theory of retaliation is outside the scope of his EEOC charge and any investigation that could reasonably be expected to arise therefrom. This court does not have to resolve that issue because even if Vogel *had* appropriately exhausted his administrative remedies, his amended retaliation claim would still fail as a matter of law. [8] As is noted above, Vogel's retaliation claim is analyzed under the *McDonnell Douglas* framework. *See Emmett,* 528 F. App'x at 262; *Fasold,* 409 F.3d at 188. Pursuant to this framework, "[o]nce an employer presents a non-discriminatory reason for termination under the … ADEA, … the employee must 'present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision.'" *Thimons v. PNC Bank, N.A.,* 254 F. App'x 896, 898 (3d Cir. 2007) (quoting *Kautz v. Met-Pro Corp.,* 412 F.3d 463, 467 (3d Cir. 2005)).

In its analysis of Count I, the court previously discussed the substantial evidence which buttresses PPSD's explanation for Vogel's consecutive adverse ratings and the reasons why Vogel's various evidentiary proffers fail to support a reasonable finding of pretext. For the reasons previously outlined, the evidence of record also precludes an inference that the PPSD's

---

[8] It appears from Vogel's brief in opposition to the pending summary judgment motion that he may be asserting a third variant of retaliation: *i.e.*, that his placement in an EIP for the 2011-2012 school year was another retaliatory act by PPSD. (*See* Pl.'s Br. Opp. Summ. Judg. [ECF No. 33] 6 ("Just weeks into the new school year, on the heels of his complaining [on May 25, 2011] about age discrimination with regard to the first EIP and unsatisfactory designation, and his grieving the same, Ms. Pearlman placed [Plaintiff] on a second EIP which was just days before his grievance hearing of this first EIP on September 26, 2011.").) To the extent Vogel is seeking to advance this theory of retaliation under Count II of the complaint, that claim is not viable. Placement on an EIP arguably is not an "adverse action" within the meaning of the statute and, in any event, this theory of retaliation is still subject to the *McDonnell* Douglas framework and would fail because, as discussed previously, Vogel failed to adduce sufficient evidence of pretext.

explanation for the second "unsatisfactory" rating was a pretext for unlawful retaliation. Consequently, even if the court were to conclude that Vogel properly exhausted his administrative remedies relative to his amended retaliation claim, the court must nevertheless conclude that this theory fails as a matter of law inasmuch as the record cannot reasonably support the conclusion that Vogel's second "unsatisfactory" rating was the product of a retaliatory motive, as opposed to being the product of a good faith, performance-based evaluation process. Accordingly, the PPSC's motion for summary judgment will be granted with respect to Count II of the complaint.

IV.    **Conclusion**

Based upon the foregoing reasons, the District's motion for summary judgment will be granted with respect to both counts in the complaint. An appropriate order follows.

By the court,

*/s/ JOY FLOWERS CONTI*
Joy Flowers Conti
Chief U.S. District Judge

Dated:  August 21, 2014